Good morning ladies and gentlemen. We have six cases on the calendar this morning. Two patent cases. A case from the Court of Federal Claims involving medical reimbursement of Defense Department people. A trademark case and two government employee cases. The latter will not be argued. They will be submitted on the briefs. So we will hear the two patent cases, the claims and the trademark case. The first of which is Mstar Semiconductor v. ITC and Genesis Microchip 05-1129. Mr. Dunner. Good morning, Your Honors. May it please the Court. There are two claim construction issues before the Court today, any one of which should result in a judgment for Mstar. Let me deal with the first of these, what we call the generated such that limitation. The Commission interpreted that clause as requiring only that there be consistency between the second clock and the source clock to obtain the required equality. I submit, Your Honors, that the Commission was wrong in this regard, is not supported by the dictionary definition, is not supported by the specification, it reads language out of the claim, it improperly relies on claim differentiation and the intrinsic and extrinsic evidence do not dictate a different result. Let me be specific. The dictionary, the Commission relied on the definition of such. Of course, we're talking about such that. When you look at the definition of such, you see they give an example. They defined it as having equality to a degree to be indicated. But when they give an example with the word that in it, the example is in a dictionary I have, which is the Webster's Collegiate Dictionary, and I'm sure you can pick anyone up and it will have a similar definition. His excitement was such that he shouted. That is language of causation. And I submit that if there was any doubt about it, if you look at pages 26 and 27 of the blue brief, we have seven bullets on those pages pointing out language in the specification, which I suggest supports our view that there's causation involved. The very last two on page 27 says the same section of the specification provides Does the second clock in your client's system cause anything to happen? Pardon, your Honor? Does the second clock in your client's system cause anything to happen? Your Honor, it is free running So it does something, right? It causes, you obtain frame equality because of what we call frame block. And that is part of the function of the second clock? No, it is part of the function of the frame block. What would happen if the second clock in your client's device were thrown away, destroyed? You need a second clock, your Honor. So your second clock causes something. But it does not cause the equality. It is a vehicle through which the frame block works. Does it participate in permitting frame equality? Assume for a moment that you've lost your argument on pixels. So just talking about frame equality. Does it participate? Does it allow? If you threw your second clock out, if you destroyed your second clock, then your system wouldn't work. So as I understood, correct me if I'm wrong, your second clock allows what I call frame equality, passing the pixel issue. But it does not cause it, your Honor. But why does it have to cause? I was going to ask you in the beginning when you moved right by the commission saying that the relationship of the second clock to the frame block has a consistency. What do they mean by that? We think what they mean by that is that it doesn't prevent the equality from happening. And what's wrong with that as a matter of interpretation? Because the specification makes clear that there is a synchronization between the second clock and the first clock. The second clock is always a constant multiplied by the period of the first clock. When you say synchronization, and this is where the language here, I want to make sure I understand. Are you talking about locking when you say synchronization? Your Honor, the specific preferred embodiment is locking. Locked clocks. We are saying that it doesn't need to be locked clocks. When you say it doesn't need to be, do you mean that claim two, incorporating claim one, is not limited to locking? That's exactly right, Your Honor. It is not limited to locking. In your opening brief, I read your opening brief to be suggesting the contrary, that it was limited that the proper reading of claim one slash two was limited to locking. And yet in your reply brief in the footnote two, I think it is, you seem to be saying it's not. And I want to make sure that I understand what your position. You know the section of the opening brief. Our position, Your Honor, is basically if we said it inelegantly in the first brief, we said it clearly in the second brief. You said it fifteen times in your blue brief, locking. The specification deals with locking. As a preferred embodiment. Yes, as a preferred embodiment. I read your gray brief as to have been a claim differentiation argument, which you didn't address directly in your gray brief. I don't know that scared off is the right word. We made it clear in our second brief that we are not restricting ourselves to locking. It impacts on the claim differentiation argument. We are restricting our argument. You're hanging your case on causation as opposed to locking. That's exactly right. But you're rejecting permission. As I talked with you earlier, you told me that your client's second clock permits frame of quality to occur. Yes. May I make my point? And I was asking you why isn't that a suitable reading of the claim language and you didn't really answer that. Well, Your Honor, because it is the frame lock that causes, that truncates the vertical blanking pixels in the destination frame and that causes the equality of frames. You need a clock to get it to work, but it is not the prime mover. It is a vehicle through which the system works. And I should note, Your Honor, that the claim language itself doesn't suggest any specific action that the second clock has to take such that the time to provide the destination pixel will be equal to the time for the source pixel. And as I say, if we've taken out of your case, I mean, if you win on the pixel argument, then you're home free as I understood it. That's true. But we're talking still at the moment as if hypothetically you've lost the pixel argument. That's true. And in that instance, I couldn't see why your insistence that such that has to mean only causation had any real grounding because I couldn't understand why consistency, the relationship with the two couldn't be one where the second clock simply is, whatever it's doing, it is not interfering with. It is functioning and it is participating in the equality of the time. Your Honor, if you were standing by a door, an open doorway, and I pushed you through the doorway, I caused you to go through the doorway, the doorway was open. If the doorway was not open, you would not go through the doorway. I caused you to go through the doorway. But I couldn't see anything in the claim language or in the specification that limited the office of the second clock to a causation effect. Your Honor, look at the last two bullets on page 27 in our blue brief. It says, as a result, in the next to last bullet, the upscaled image is provided at the same frame rate as at which the source image is received. They're talking about the second clock. In the last bullet, the specification provides destination clock frequency has been computed to ensure that the destination frame rate is equal to the source frame rate. All through the specification, there is causation between the... Well, that's two examples and the question is whether or not that's talking about a preferred embodiment or whether that's defining the limit of the claim. Your Honor, if you look... Is that what your case hangs on, these two bullets? No. It is an example of the fact that there's causation. There's causation all the way through this. If you look at page 2, where they're talking about summary of the invention, summary of the invention lines 33 to 35 in accordance with the present invention, the clock period of the second clock signal is equal to a constant times the clock period of the first clock signal. That's what this synchronization is all about. If you look at the equations on pages 233 and 234, they're all about causation between the second clock... But aren't the equations attached to dependent claims? Your Honor... Specific equations. I thought that was a part of a further definition of a dependent claim. Your Honor, the equations implement the principle of the claimed invention. There's a section titled The Principle Underlying the Present Invention on page 233. You will see that under the principle of the present invention in column 5, lines 53 on, to maintain the same frame rate, upscale 100 generates pixel data for the destination image using a clock, referred to as a destination clock, which is different than the source clock. That's part of the principle of the invention. When you look at the equations, you will see that they are implementing the principle of the invention. The specification also talks... I'm sorry, you were about to ask a question. Does your client's device make any use at all of vertical blanking pixels? Vertical blanking pixels? Yes, it does, but... So why should we... Perhaps I misunderstood the rest of the technology here, Mr. Dunner, but I understood your argument to be that when we're looking at the overall scheme of the pixels, we count the active pixels, which are horizontal, and we count blanking pixels in the horizontal run, but we ignore vertical blanking pixels. Your Honor, that's our second point, so let me address your point. Right, so please do, because I couldn't understand why, if indeed your client's device depends upon vertical blanking pixels to make it work, why we would ignore them for any purpose? Your Honor, because we're dealing with the language in independent claims. The language in claim 1 says in 1A, which is on page 17 of our rubric, receiving said plurality of source pixel data included in said source image frame using a first clock signal. Receiving is the key word. Source pixel data. The specification makes clear, and the commission held and the ALJ held, that data, pixel data is only received during the active period, and that is set forth specifically in the specification. I see, and your argument is that the vertical blanks are received during an active period because it's active, blank, active, blank, active, blank. Those are the horizontal blanking pixels. Pardon me, I'm excused. Yes. Only the interspersed ones, between the first active and the last active, because if you're going ten blocks... You can't have two actives without a blank in between. If you're going ten blocks, you need to cross the street between the ten blocks. The vertical blanking pixels have no active pixels in them, and that was what the commission based its ruling on, and its holding on the merits of this issue is inconsistent with its holding that pixel data means active pixels, for the reason I just mentioned. Now, our adversaries have argued that, well, we are... Well, isn't the argument that what you are receiving is a plurality of source pixel data included in the source image, and that the pixel included in the source image picks up the vertical blanks? It does not pick up the vertical blank. Isn't that the argument that was made? It picks up only the interspersed horizontal blanking pixels. The claim language has differentiated from 18, 22, and 30, which talks about frames. Claim 1 talks about using the same doctrine of claim differentiation that they rely on for the other issue. That shows that pixel data is different. The specification makes clear that you can have portions of frames, and the specification further makes clear that one skilled in the art would know how to take every one of those equations and apply it to portions of a frame. The active pixels are a portion of a frame. Mr. Dunner, our clock has mostly run down, but since you've had a lot of questions, we'll give you three minutes of rebuttal time. Thank you, Your Honor. Mr. Lieberman for the Commission. And you'll split your time with Mr. Cordell. Good morning. May it please the Court.  I've asked Mr. Dunner because I think that they need certain clarification. Now, with regard to the change of the position, we believe that the inconsistency between the reply brief and the opening brief actually amounts to the change of the position. This change may be explained by the history of this case. In 481 underlying investigation, respondents took the position that it actually amounts to locking of the clocks in the context of this patent. And Amstar pursued the same approach, both in the underlying 491 investigation where they were respondents, and later when they filed the opening brief. Now, when they filed the reply brief, they took the entirely inconsistent position. And I have multiple, I mean, I don't want to, I mean, I can point to specific provisions in the briefs. I just assume that everybody read the briefs. I don't want to waste time. But clearly they changed the position. That's number one. Well, were you prejudiced? I'm sorry? Were you prejudiced by the change? So what? It's perfectly clear that the blue brief is a locking brief. There's no question about that, right? But what's that got to do with deciding the case? Why don't we get to the gist of the case? Yeah. I would say that on the merits, it doesn't change the fact that we believe Amstar is losing in this case. But technically... I mean, below, the causation argument was made fully and fleshed out below, right? So there was no big surprise, those of us that went back and read the record below. Well, it was a change in the position, and so for that reason, a lot of our brief and a lot of respondents' I'm sorry, intervenors' brief was devoted to kind of defending against this argument that causation essentially amounts to locking. Also, I believe that the resource of the court and the resource of the LJB law also were spent, you know... But look, the question is... Was the commission correct in its interpretation? Yes. I think that whether they changed or not, under both the original construction and the changed construction, we believe that the commission's construction is correct. When the commission said the relationship that's created in claim one between the second clock and the first or the second clock for the purpose of having this equality of input and output, they used the word consistency. Correct. And what do they mean by that? Well, consistency means that the second clock, as the specification provides, the second clock can take different values and still the full frame equality will be maintained. And I can point to specific provision in the specification. Why is the word consistency the correct word to describe the effect that you just stated? Well, for several reasons. One thing, the claim language and the specification do not require more narrow interpretation of the word such that... I'm quibbling with the word consistency. Why isn't a better way to look at this to simply say the second clock is a functional piece of equipment that operates in producing equality and whatever it does, it doesn't stand in the way. It permits or allows inequality of input and output. There are several reasons, but I will just point to one reason. The specification discloses specific embodiment on page A234. Which column? That's column 7 and 8 beginning with equation 13 on column 7 and so equations 13, 14, 15 and the accompanying discussion and the equations 18 and 19 on column 8, they disclose that the second clock can be calculated in different ways and it will take different values and at the same time... That was in columns which? Columns 7 and 8? Columns 7, equation 13, 14 and 15 and the discussion in between. It discusses how the patent calculates so-called vertical scaling factor and the same value is used to calculate the period of the second clock. That's on column 8, the third full paragraph. I believe it's line 12 in my copy. So it's equation 18 and 19. And so if we agree with the MSTARS construction, that will read out this disclosed embodiment because under their construction you change the second clock and the second clock causes the equation. The full frame equality. So this portion discloses that you can change the clock. And by the way, all the experts in the field believe that there is a range of values that the second clock can take and still full frame equality will be maintained. Would you agree that if Mr. Dunner for his client is correct on the so-called pixel issue, then his client will prevail? I also believe that he is not correct. That question can be answered yes or no. No, and I can explain why. I would refer to the language of the claim first. The stuff that MSTARS doesn't do. Let me make sure that we're all on the same page here. I think Judge Clevenger's question was not whether you agree with Mr. Dunner's claim construction with respect to that issue, but does Mr. Dunner win his case if he prevails on that issue? The answer to that is yes, right? If MSTARS prevails on one of these claim limitations, well, that would indicate that the claim construction should be changed. In other words, and the consequence would be that erroneous claim construction would require reversal in this case by this court, right? Well, I think that that would cause probably remand to the commission in order to make certain... Well, with regard to Mr. Dunner's argument on what I call the pixel issue, saying that clearly the claim that he pointed to only means receiving the active data, and then he said he's got a claim differentiation argument in his favor that is equally as strong as the one that's being mounted against him on the other side on the such that. So what's your response to his claim differentiation argument? Well, I believe that if we're talking about pixel data here, if we look into the claim one, we have to read not only the wearing clause, but also the preceding clauses, and this process includes not only upscaling, but there is a receiving in subparagraph A, there is upscaling in subparagraph C, and there is providing in subparagraph D. Now, the ALJ in the underlying 481 investigation specifically found that the timing relating to this entire process is not limited to just upscaling. When we're talking about upscaling, then pixel data essentially amounts to active pixels, and therefore we're kind of limited by this process. But wearing clause incorporates all the steps. So you're not disagreeing... Go ahead. I take it then you're not disagreeing with the argument Mr. Dunner made with respect to limitation A of claim one, in which he said the reference to the property of source pixel data, reference only to the active data, plus the horizontal... No, I don't think that this argument is correct, because source pixel data here should be read in the context of a frame. Every time pixel data is used in the claim, including subparagraph A, C, D, and further, every time it says pixel data, it says pixel data either in the frame or representative of a frame. And one ordinary skill in the art understands, based on the intrinsic evidence and the expert testimony of that. Let me make sure that I understand you, because the full limitation says plurality of source pixel data included in said source image frame. Now why isn't a fair reading of that to be that within the scope of the entire frame there is certain source pixel data, which is the, as I understand the commission's view of the term pixel data, is only the active pixel data. Well, pixel data itself is active pixels, but here the claim talks about the timing. Well I understand, but I'm looking right now at A. Okay, let's look at A. Do you interpret the term source pixel data in A to include not only the active pixels, but also the vertical blanking data? Yes, we do. Why? Because, number one, this is consistent, and that's how we should read this in light of the specification, which underscores that the main invention, the main feature of the invention here, is this full frame equality, where you have to calculate all the frame. And there are numerous provisions of the specification, I don't want to repeat them. So the first, we have to... Even if you strip, which I don't think we should do, under the conventional rules of plane construction, we should not probably strip everything, we should read it in light of the specification. But, even if you strip, still every time pixel data appears here, it appears in the context of frame, image frame, destination frame, or source image frame. Every time except A. I'm sorry? Every time except A. Well, it says set plurality of source pixel data included in set source image frame. Yeah, but included within could mean a subset. In fact, that's probably, between the various choices, probably the most natural reading. Well, if you read it out of the context of the rest of the claim, and out of the context of the specification, and out of the context of what experts agreed on, well, then maybe it's one of possible readings. That's why we're here. Mr. Lieberman, you're well into Mr. Cordell's time, so we'll move to Mr. Cordell. We'll give him his full seven minutes. Thank you, Your Honor. Your company has spent a little time here at the court, I gather. We have, we have. Twice in one week is a little unusual. May it please the court, Ruffin Cordell from Fisher & Richardson on behalf of Genesis Microchip. I'd like to begin with the causation issue, if I might, and address some of the questions of the court with respect to consistency. I do believe that consistency actually has a fairly well understood meaning in this case, and it has to do with the fact that there is a range of clocks that could be used. Is it a term of art in the field? If you were talking to, if you went to the upscalers convention out in Las Vegas, would they all be talking about consistency? They're all upscale of Las Vegas. So it's not a term of art? I'm sure they're a fun group, Your Honor. The reality is that the consistency per se, I don't believe is a term of art. I don't believe it was litigated. We didn't really get it until we got the commission's decision. Where did it come from? Who suggested to whoever wrote the commission's opinion that consistency is the word that ought to be dropped in here to make the correct description? My recollection is imperfect as to whether or not we bandied about before the ALJ or not, but it certainly was reflective of the ideas that were exchanged. The idea being that there were a range of clocks that would support this second clock function. The analogy that we often use is the old I Love Lucy show, where if you can remember the episode where she was wrapping candy as they were coming off of a conveyor, the rate at which she was wrapping the candy is the second clock. If she is too slow, if the second clock is too slow, the candy spills out onto the floor. If she's too fast, she runs out of candy and that causes errors downstream. That wasn't upscale. So the second clock essentially has to exist because it's a claim requirement, and then the second clock has to operate in some manner that allows the achievement of the equality either at a pixel level or a frame level. Absolutely, Your Honor, and the terms permits or allows would also be acceptable, at least in our view. But causation is not allowed. Causation is not acceptable. And why? Even though you just said that Lucy's failure to keep up cost the boxes not to be filled. Thank you. I bespoke then. I don't want to play games with you. That's why I asked the question. But that was causing an error, and I will certainly admit... As opposed to causing the thing to be done properly, which would happen if she were working at the right rate. She was locked into the right rate. That's right. But that's still causation. It's not causation in that she would cause an error if she had the wrong clock rate because that would be the factor that led to the candy falling on the floor. But her operating within the correct rate wouldn't cause the synchronicity of the boxes. Well, it's constructive causation because it permits the effect. Is that what you're saying? Exactly, Your Honor. Exactly. And the constructive causation is... Which seems a little artificial, doesn't it? Just to have said it? Well, I'm continuing to have to backtrack here. The reality is that it is a factor that contributes to the equality but does not cause it. And there's nothing in this intrinsic record anywhere to support the idea that setting that second clock rate will cause the equality. That's a very, very important fact here. When we look at the claim language itself, it says such that. When we look at Mr. Dunner's bullet points, they say such that over and over and over again, a mere repetition of the claim language. The technology involved itself, the testimony at trial was that even if we were to go to the extreme and lock the two clocks together, that does not cause the frame equality. And that finding was one that was not challenged by MSTAR. And so I think that's very, very important. But it's true that the accused device achieves its result in a substantially different manner than contemplated by the patent, is it not? I don't think so, Your Honor, in the following way. The accused devices achieve equality using the same techniques that are disclosed as part of the 392 patent, which is cited as part of the specification of the patent in suit. So Mr. Eaglet, the inventor of the 867 patent, had this prior patent, the 392 patent, that talks about using V-sync and H-sync signals. Right, but with regard to the claims as you would have them properly interpreted and all of the usefulness of the spec, the specification in getting there, it just struck me that the MSTAR devices operate in a substantially different way. And I was wondering, this is not a reverse doctrine of equivalence because that argument hasn't been made. Mercifully no. The answer is that they absolutely do operate in the way that the 392 patent application describes. And so from that perspective, they operate within the specification of the overall patent. And the claims themselves again simply require that there be this consistency between the second clock and inequality of frame periods. As to the other issue. As to the pixel data issue, what I would like to focus on, if I might, with respect to the overall frame issue, is Claim 11. Something that hasn't gotten mentioned here in court this morning. And the fact is that Claim 11, I believe, compels the Commission's construction of the equal frame rate clause. Claim 11 tells us that there is a very, very specific relationship between the input clock and the output clock. This is the one that bore the claim differentiation arguments that were used in the wear-in clause debate. I'm sorry, the clock consistency debate. And in Claim 11, what it tells us is that the proper measure of the relationship between the first clock and the second clock is based on a full frame of data. It's an absolute full frame of data. The equations that are used are equations 18 and 21, which talk about a full frame of data. So if MSTAR were correct, and the wear-in clause should be limited to the active periods only in Claim 1, the net result would be a dependent claim in Claim 11 that is outside of its independent claim. And certainly that cannot be correct. To the extent there's any question about the equations that are set forth in Claim 11, I'd refer the Court to the appendix at A3178 and 3179, which are charts, explanatory charts produced by MSTAR's own expert that make clear that the equation that's used on page 3179, which is the one reflected in Claim 11, is in fact a full frame equation. And in contrast, the equation presented on page 3178 is the active region only equation. But the active region only equation is not in Claim 11. The full frame equation is. If I could also comment on Judge Cleveter's question about claim differentiation. Very briefly. Briefly. Oh, okay. The reality is the claim differentiation argument offered by MSTAR uses other independent claims such as Claim 18 that does recite the word frame but also recites the word pixel data. You have the same issue essentially in Claim 1 as you do in Claim 18. The fact that it stands as an independent claim means it's a much weaker construction tool than if it were a dependent claim that had a single limitation such as Claim 11 to add to the process. Thank you. Thank you, Mr. Cordell. Mr. Dunner has a few minutes left. Thank you. Let me deal with Mr. Cordell's Claim 11 point. Claim 11 is not inconsistent with our position. Claim 11 talks, is dependent on Claim 10, which talks about lock clocks, which says that there's a proportion in Claim 10 and Claim 11 just tells you how the proportion is calculated. There's nothing inconsistent with calculating a proportion using vertical blanking pixels or anything you want to use, but that is totally consistent with our position that the language of Claim 1, particularly 1A, dictates a contrary result. As to the claim differentiation point claim where Mr. Cordell said it has additional language, if you look at the last clause of Claims 18, 22, and 30, you will see he says we're in said destination clock signal has a clock period such that said source frame rate is equal to said destination frame rate. It doesn't use pixel data, it uses frame rates. The same in each of those three claims. That doctrine supports our position. Going back to the such that clause, of course Mr. Cordell is in error when he says all we say is such that, such that, such that. The first bullet, the use words like because of, as a result, to ensure that. And I would make one last point, and that is on the such that language, if you follow the approach that the ITC and Genesys are taking, you essentially are wiping language out of the claim, because Step D in Claim 1 requires that the destination pixel data is provided using said clock signal. If it just means consistent with, or just means permits, then the language after wherein, namely said second clock signal is generated to have a clock period such that, you don't need that language. It renders it superfluous, which I suggest is a reason not to adopt that approach. Unless there are questions from the bench, Your Honor, I have nothing more. Thank you, Mr. Dunner. The case will be taken under advisement. Thank you.